J-S09025-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| PAUL OSCAR ALTMANN | : | |
| | : | |
| Appellant | : | No. 2422 EDA 2025 |

Appeal from the Judgment of Sentence Entered July 30, 2025
In the Court of Common Pleas of Pike County Criminal Division at No(s):
CP-52-CR-0000337-2024

BEFORE:   MURRAY, J., LANE, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY LANE, J.:                    **FILED APRIL 30, 2026**

Paul Oscar Altmann ("Altmann") appeals from the judgment of sentence imposed following his convictions for driving under the influence of alcohol or other controlled substance ("DUI"), and related offenses.[1]  We affirm.

We glean the following facts from the evidence and testimony presented at trial.  In December 2023, Pennsylvania State Police ("PSP") Trooper Joseph Richards ("Trooper Richards") was on patrol in Palmyra Township, Pennsylvania when he identified a vehicle traveling on the road in front of him. Upon entering the vehicle's license plate number into his mobile data terminal, the trooper discovered that the vehicle's registration had expired, and that its owner, an individual other than Altmann, was a known drug user with a

---

[*] Former Justice specially assigned to the Superior Court.

[1] **See** 75 Pa.C.S.A. §§ 3802(d)(1)(i), 1543(a), 1301(a), 4703.

suspended driver's license stemming from a prior DUI conviction. Trooper Richards initiated a traffic stop as a result of the vehicle's expired registration, whereupon he identified Altmann as the driver of the vehicle.

During the traffic stop, Trooper Richards learned that Altmann was driving on a suspended license, and observed that Altmann appeared to be pale and sweating, with bloodshot eyes and dilated pupils. The trooper additionally detected a moderate odor of alcohol and marijuana emanating from Altmann's vehicle. These observations led Trooper Richards to believe that Altmann had recently used drugs, and that he had been driving under the influence of a controlled substance. After Altmann failed multiple field sobriety tests, Trooper Richards took him into custody on suspicion of DUI. In doing so, the trooper obtained Altmann's consent to a blood draw and chemical testing for the presence of narcotics in his system.

Trooper Richards then transported Altmann directly to Wayne Memorial Hospital, wherein he observed a phlebotomist draw Altmann's blood, transfer it into two vials, and place them into a sealed and signed box container, equipped with a chain of custody form (hereinafter "specimen kit"). Trooper Richards then took possession of the specimen kit and transported it directly to the PSP Blooming Grove station where he placed an additional seal bearing his signature on the kit before entering it into the station's evidence storage.

Trooper Richards additionally filled out a toxicology request form addressed to Wyoming Regional Laboratory, and an investigator at PSP

Blooming Grove thereafter hand-delivered both the specimen kit and the request form to an evidence technician at Wyoming Regional Laboratory for narcotics testing. Both the investigator and evidence technician signed and dated an evidence submission receipt, which they appended to the accompanying request form.

As a result of its inability to test for the presence of certain controlled substances associated with a DUI (hereinafter "DUID"), the Wyoming Regional Laboratory thereafter transported the specimen kit to the PSP Harrisburg Crime Lab, which had such capabilities. There, the testing of Altmann's blood for controlled substances, including cannabinoids, revealed the presence of nine nanograms per milliliter of Delta-9 THC — the main psychoactive component of marijuana, a Schedule I controlled substance.[2] Based on these lab test results, police arrested Altmann and the Commonwealth charged him with, *inter alia*, DUI.

In May 2025, the matter proceeded to a bench trial, during which the Commonwealth presented testimony from both Michael John Dolan, Jr., Ph.D. ("Dr. Dolan"), an expert in toxicology and the analyst responsible for producing the underlying toxicology report containing Altmann's test results, and Trooper Richards, respectively. Immediately prior to the introduction of Dr. Dolan as the Commonwealth's first witness, however, Altmann objected

_____

[2] The toxicology report indicates that this result has a margin of error at plus or minus two nanograms per milliliter.

- 3 -

to the relevancy of his testimony. Specifically, Altmann argued the Commonwealth was calling Dr. Dolan "out of order" with respect to the specimen kit's chain of custody, as it had not yet established how Dr. Dolan came to possess the blood samples that he analyzed in his report. N.T., 5/19/25, at 4-5. The trial court subsequently overruled Altmann's objection and proceeded to hear the following testimony from Dr. Dolan regarding the chain of custody for the blood samples:

> [The Commonwealth]: . . . Before we go into the specific details of this case and your work on this particular case, can you just give us a nuts and bolts of how it is that we test substances and how confident we can be in specific results?
>
> [Dr. Dolan]: Sure. Originally, you want me to start with the evidence receiving protocols?
>
> Q. Yes, please.
>
> A. Okay. Originally, the blood sample after it's been collected will at some point make its way to the State Police Harrisburg Crime Lab. At that point it is received and it is checked to make sure that it has an intact seal, and that that seal has some kind of marking and date on it as well. At that point the information on the outside of the kit also is compared to the request form that we receive from the submitting agency, then the receiving technician will move it into a secure refrigerated storage and it will stay there until either it's assigned to an analyst or a chem tech will open the kit. Once the kit is taken out and opened, again the outside seal is checked to make sure it was intact and that it was sealed properly. The information on the outside of the kit is also checked and then once it's opened any information on the inside of the kit if there is any will also be checked against the request form that we received.
>
> Q. . . . [W]hat protocols or procedures are in place to ensure the integrity of the sample and to make sure that what comes in is being tested fairly and accurately?

- 4 -

A. Yes. So once the kit comes in, it is given a lab number with a label. It has a bar code on it as well. That bar code is also applied to the request form that I mentioned. From that point on that stays with that evidence until it[']s destroyed[,] and again the seal is being checked at each of those steps, and then once the kit is opened and the seal is broken, the person who opens the kit will also apply a subitem 1.1 bar code label with the same incident number onto the blood tubes themselves.

\* \* \* \*

Q. Are you familiar with the Wyoming Regional Laboratory . . .?

A. Yes.

Q. Does Wyoming Regional Laboratory have the ability or capabilities of testing for controlled substances and blood?

A. Not for a DUID.

Q. Okay. So . . . in order for a [PSP] trooper to test blood, they typically would then send it down and it gets all the way sent down to Harrisburg?

A. Yes. Sometimes it originally gets sent to the Wyoming Regional Lab and then it gets sent back down to us. Sometimes it could be submitted directly to us.

Q. And then if it is sent originally to Wyoming and then forwarded onto you, would it be possible for Wyoming Regional Laboratory to be on the paperwork?

A. Yes.

Q. Okay. Now again, I want you to explain what happens . . . if or when you receive a tube where the seal has been tampered with or broken or things of that nature?

A. So if we see a tube that has clearly been tampered with, we would not test that[,] and for example, some[]times we have received tubes from a hospital that has been [opened] previously and is labeled with the testing that has been done and we wouldn't test that per our policies.

Q. Okay. Why is that?

A. Because we wouldn't be able to ensure that proper chain of custody per our procedures and policy.

Q. Now I want to direct your attention to this specific case, okay? Are you familiar with the lab report number I'm going to direct your attention to W23-03628-1? Are you familiar with that lab report?

* * * *

A. [Yes.] Is there any specific detail you would like? Can you clarify?

Q. . . . [C]an you start from the beginning[? W]ere you assigned this specific lab report?

A. Yes. I was assigned this case. [T]he analyst who's assigned it will be the one who ultimately authors the report, and since I authored this report it was assigned to me.

Q. Okay. And tell us what happens, take us from when your lab received it.

A. So from when our lab received it, it would've –– in this case it looks like it was received likely by the Wyoming Regional Lab[,] and I can tell that by the bar code and the fact that it says that it was sent to Wyoming Regional Laboratory. At that point it would have been checked and assigned a bar code and then put in refrigerated storage until it was transmitted to our lab in Harrisburg.[3]

* * * *

_____

[3] At this juncture, Altmann objected to Dr. Dolan's testimony regarding what transpired at Wyoming Regional Laboratory, as he was not physically present to witness the facility's treatment of the specimen kit. Although the trial court thereafter advised Dr. Dolan to "try to focus on things that [he has] first[]hand information on[,]" it ultimately overruled the objection, reasoning that it allowed Dr. Dolan to "take a look at his notes" which contained such information. N.T., 5/19/25, at 13.

Q. When [the specimen kit] arrive[d] in Harrisburg, was the seal intact?

A. Well, that would be based on the information that I have in my notes.

Q. Okay. If you may.

A. Not my own, I mean[,] so what happens is a chem tech would open the [specimen] kit. In this case[,] that's what happened[,] and they filled out an evidence receiving worksheet[,] and as the assigned analyst I then review the worksheet to make sure everything appears to be correct, but the person who originally viewed the intact seal would have been the person who opened the kit.

Q. And specifically, what's your role in the process of testing this particular substance.

A. So once I receive the tubes, because in this . . . case the [specimen] kit was opened like I said by the chem tech, and at that point then I would analyze or look at the information on the tube if I can see any and check it against the evidence receiving worksheet as well, and any photographs of the evidence that were submitted along with it[,] and I can look at those and compare that to the [evidence] receiving worksheet as well.

Q. What happened in this specific case?

A. So in this case I do have some photographs that were submitted by the person who opened it. They appear to be photocopies of the [specimen] kit[,] which has the lab number as I mentioned before that matches with this case, and I checked to make sure that all the information on here did appear to match what was on the [toxicology] request form.

Q. And specifically take us through your involvement . . . with the [blood] sample. Let me ask you this[,] does it relate to a specific individual?

A. Yes. So the name on the tube was . . . Altmann.

Q. Okay. And that specific tube, is there a submitting agency that submitted that tube?

A. So the tube was submitted inside the [specimen] kit[,] and the [specimen] kit it appears was submitted by PSP Blooming Grove.

Q. And does it indicate the date of the incident that this sample was in relation to?

A. Yes.  December 9th[,] 2023.

Q. And what about the place that the sample was originally taken from?

A. According to some documentation that was submitted with the sample, it appears it was collected at Wayne Memorial Hospital.

Q. . . . [A]re you familiar with [PSP] incident numbers?

A. Yes.

* * * *

Q. . . . .[O]n your specific reports, that you eventually report with regards to results, that [i]ncident number also tracks with that given sample.  Is that correct?

A. Yes.

Q. Now take us back to . . . your involvement with regards to the [specimen kit in your lab report].

A. Okay, yeah, so my involvement was I initially took the tubes out of the secured refrigerated storage[,] and I filled out what's called a blood drug worksheet[,] and that includes information like approximate volume of blood in the samples[,] and at that point then I prepared for screening.  . . ..

* * * *

Q. [In the second page of your report noting the results of your testing, c]an you explain to us the language when it comes to L-I-M-S, LIMS Management System?

A. Yes.  So the LIMS is the laboratory information management system.  It's where all the electronic records are kept for our evidence.

Q. Were there any hiccups in the system when it came to the electronic management system as it relates to this specific sample?

A. Yes, there was some information that was lost in our electronic management system.

Q. Can you tell us what that was and why that occurred?

A. . . . What I can say is that some information such as . . . some parts of the initial chain of custody I don't have access to anymore. The information that I do have in relation to that would be the lab sticker that we received which has the date and time that it was received and I also have the date and time that it would have been taken or that it was taken out based on the evidence receiving worksheet from the person who took it out, wrote the start date and the open date.  That's what I'm going off of when I say that, that would be the date that they took it out and I also have the date that I started taking custody and I maintained a proper chain of custody while the systems were not functioning properly.

Q. Okay.  So when the electronic system that monitors chain of custody gets haywire, you specifically went through and made a handwritten log of that chain of custody?

A. For the custody that I had, yes.

Q. Okay.

A. And then once the system was restored[,] we went back to electronic.

* * * *

Q. Dr. Dolan, is [Commonwealth's Exhibit No. 3] what you were referencing previously?

A. For the paper chain of custody, yes.

* * * *

Q. And what specifically is it that you're looking at there?

A. So this has the information of when [and] from where I would have taken the evidence and put it back during my testing procedures.

Q. And your testimony is that you specifically personally did this when the electronic system went down to make sure that everything was intact and the integrity of the testing was there?

A. Yes.

* * * *

Q. Now Dr. Dolan, as a result of [that document,] and [in] addition [to] other safeguards and protections that you have in place, do you have a reasonable degree of confidence in the results that we see in . . . your toxicology report?

A. Yes.

Q. Are there any concerns or loss of chain of custody that would result in you not reporting the results?

A. No.

*Id*. at 9-16, 22-26 (footnote added).

Trooper Richards thereafter testified to the above-summarized series of events, beginning with his initial encounter with Altmann as the driver of the vehicle, and ending with his testimony regarding the process by which he entered Altmann's blood into evidence storage and requested its forensic analysis. At the conclusion of the trial, the court did not render a verdict; instead, the court issued an order the following day in which it found Altmann guilty of the above-listed crimes. *See* Decision and Order, 5/20/25, at unnumbered 1.

On July 30, 2025, the matter proceeded to sentencing, whereupon the trial court imposed a sentence of three to six months' imprisonment for the crime of DUI. That same day, the trial court issued an order denying counsel's oral motion seeking to obtain bail for Altmann pending appeal. In its order denying the motion, the court reasoned that "based on its review of [Altmann's] criminal history and the presentence investigation in this matter, [it found Altmann] a danger to the community and himself." Order, 7/30/25, at unnumbered 1 (unnecessary capitalization omitted). Altmann filed a timely notice of appeal, and both he and the trial court complied with the requirements of Pa.R.A.P. 1925.

Altmann raises the following issues for our review:

1. Whether the trial court lacked sufficient competent evidence for conviction of [DUI].

2. Whether the trial court erred in admitting lab test results which were hearsay, not properly authenticated, were not accurate, were not admissible, and/or where there was inadequate foundation or a break in the chain of custody; and where the Commonwealth's witness did not have personal knowledge of the chain of custody, information on the chain of custody was missing or lost[,] and where the chain of custody of the blood sample was speculative.

3. Whether the trial court abused its discretion on the denial of bail pending appeal.

Altmann's Brief at 6 (unnecessary capitalization omitted, issues reordered).

In his first issue, Altmann challenges the sufficiency of the evidence underlying his conviction for DUI. Before we may address the merits of this issue, however, we must first consider whether Altmann has preserved it for

our review. Pertinently, to preserve a sufficiency claim, an appellant needs to specify within their Rule 1925(b) concise statement "the element or elements upon which the evidence was insufficient[,]" as the satisfaction of this requirement is what enables this Court to "analyze the [at-issue] element or elements on appeal." **Commonwealth v. Tyack**, 128 A.3d 254, 260 (Pa. Super. 2015) (citation omitted). Where an appellant omits this information from their concise statement and "does not specify the allegedly unproven elements, the sufficiency issue is waived on appeal." **Id**. (original brackets omitted). Such waiver applies even where the trial court addresses the issue in its Rule 1925(a) opinion and where the Commonwealth does not object to the defective Rule 1925(b) statement. **See Commonwealth v. Williams**, 959 A.2d 1252, 1257 (Pa. Super. 2008) (stating "[t]he Commonwealth's failure and the presence of a trial court opinion are of no moment to our analysis because we apply Pa.R.A.P. 1925(b) in a predictable, uniform fashion, not in a selective manner dependent on an appellee's argument or a trial court's choice to address an unpreserved claim") (citations omitted).

Here, Altmann's court-ordered Rule 1925(b) statement simply includes a blanket assertion that the trial court "lacked sufficient competent evidence for conviction of [DUI]." Amended Concise Statement of Matters Complained of on Appeal, 10/9/25, at unnumbered 1. Altmann did not specify in his concise statement which element or elements of DUI allegedly went unproven at trial. While we observe that the Commonwealth did not object to the

- 12 -

vagueness of Altmann's sufficiency claim, and the trial court addressed the topic of sufficiency in its opinion, we reiterate that these observations are of no moment to our Rule 1925(b) analysis. *See Williams*, 959 A.2d at 1257. Accordingly, because Altmann's Rule 1925(b) statement fails to "specify the element or elements upon which the evidence was insufficient" to support his DUI conviction, we are constrained to hold his first issue is waived. *Tyack*, 128 A.3d at 260 (citation omitted); *see also Williams*, 959 A.2d at 1257-58.

In his second issue, Altmann challenges the trial court's admission of the toxicology lab test results as a result of gaps in the specimen kit's chain of custody. Preliminarily, this Court has held that "any issue regarding gaps in the chain of custody relate[s] to the weight of the evidence, not its admissibility." *Commonwealth v. Witmayer*, 144 A.3d 939, 950 (Pa. Super. 2016). Accordingly, our standard of review is as follows:

> An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court. Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. In order for an appellant to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court.

*Commonwealth v. Smith*, 146 A.3d 257, 264-65 (Pa. Super. 2016).

When reviewing chain of custody issues pertaining to physical evidence, our Court has provided the following guidance:

> There is no requirement that the Commonwealth establish the sanctity of its exhibits beyond all moral certainty. It is

- 13 -

sufficient that the evidence, direct and circumstantial, establish a reasonable inference that the identity and condition of the exhibits remain unimpaired until they were surrendered to the court.

* * * *

Moreover, [t]here is no rule requiring the prosecution to produce as witnesses all persons who were in a position to come into contact with the article sought to be introduced in evidence[, as p]hysical evidence may be properly admitted despite gaps in testimony regarding custody.

***Commonwealth v. Feliciano***, 67 A.3d 19, 29 (Pa. Super. 2013) (*en banc*) (citations and quotations marks omitted).

Altmann argues the trial court erred by "admitting into evidence the lab test results from [his] blood work[,]" as he claims the Commonwealth failed to "establish a reasonable inference that the identity and condition of [his blood] remained unimpaired until tested." Altmann's Brief at 12-13. In doing so, Altmann generally avers that Dr. Dolan's testimony was insufficient to establish the chain of custody of the specimen kit prior to his physical receipt of its included blood samples for testing.

Altmann initially highlights that although Dr. Dolan was "the assigned analyst" for the specimen kit, "he was not the one who viewed the intact seal" upon its delivery to the Harrisburg Crime Lab, nor was he the individual who originally opened it. ***Id***. at 14. Instead, Altmann emphasizes that Dr. Dolan could only offer that the specimen kit "had been opened by a chem tech who then filled out [an] evidence receiving worksheet." ***Id***. Altmann next refers this Court to Dr. Dolan's testimony that the crime lab's electronic information

- 14 -

management system failed to fully document the specimen kit's chain of custody throughout its testing. Altmann asserts that without this information, Dr. Dolan could not confirm the sanctity of the specimen kit's contents while it was in the Harrisburg Crime Lab prior to his personal involvement.

Altmann additionally contends that the Commonwealth's reliance on Dr. Dolan's testimony to establish the specimen kit's chain of custody was misplaced, as Dr. Dolan "relied heavily on protocols and procedures that are normally in place to en[s]ure the integrity of a sample when it comes in for testing," in lieu of his own observations. *Id*. at 17. To exemplify this, Altmann points out that when "Dr. Dolan testified to what likely would have happened at the Wyoming Regional Laboratory[,]" he readily admitted to providing this testimony "without information regarding what transpired with the sample at that location." *Id*. Consequently, Altmann insists that because Dr. Dolan "was incapable of creating a strong inference that the [specimen kit] was not impaired in any way" at the time of testing, the trial court erred by admitting its respective lab test results. *Id*.

Lastly, in light of his above conclusion, Altmann relies on this Court's holding **Commonwealth v. Hess**, 666 A.2d 705 (Pa. Super. 1995) to argue that the trial court's improper admission of the toxicology lab test results was not harmless error. Altmann clarifies that in **Hess**, this Court found the improper admission of a blood alcohol test harmless where the Commonwealth had also entered into evidence a duplicative blood alcohol test that similarly

supported the appellant's DUI conviction, and of which there was "no suggestion [it] was invalid or unreliable." *Id*. at 709. By contrast, Altmann argues that because the Commonwealth in his case did not present any evidence other than the toxicology lab test results that could establish each element of his conviction for DUI, this Court should not find its admission to be harmless.

The trial court considered Altmann's second issue and determined that it was without merit, reasoning as follows:

> . . . Altmann's . . . issue concerns admission of certain laboratory test results of a sample of his blood taken at the time of the offenses. The report of results was presented by Dr. . . . Dolan of the [PSP] laboratory in Harrisburg. Dr. Dolan was on the witness stand for approximately half an hour, and was thoroughly examined and cross-examined by Commonwealth and defense counsel. He expressed confidence that proper chain-of-custody procedures had been followed at every stage, which he had [the] opportunity to describe in detail, and had no doubt that the sample tested was that taken from . . . Altmann, and that the same had not been exposed to any external interference or contamination. . . ..
>
> Later, the Commonwealth presented the testimony of Trooper . . . Richards . . .. In addition to testimony concerning the traffic stop of . . . Altmann's vehicle and the subsequent investigation, [Trooper] Richards was also examined and cross-examined on the taking of . . . Altmann's blood sample, for which the trooper was present, and his personal participation in submitting the same for testing. The laboratory submission form was offered as Commonwealth's Exhibit 8 and admitted without objection.
>
> In making [its] decision, [the court] relied on the testimony of Dr. Dolan and [Trooper] Richards, both of whom [the court] found to be credible as to the provenance of the blood sample, the following of proper chain-of-custody procedures, and the test results. . . . Altmann has complained that the chain-of-custody

was "speculative[,"] but in the absence of any evidence of tampering or misdirection, [the court] believe[s] that the only speculation is on [his] part. [The court] note[s] again that the lab test results . . ., Dr. Dolan's chain-of-custody notes . . ., and the trooper's lab test submission form . . . were all admitted into evidence without objection.

Trial Court Opinion, 10/17/25, at 3-4 (unnecessary capitalization and punctuation omitted).

After careful review, we discern no abuse of discretion by the trial court in relying on Dr. Dolan's lab test results to convict Altmann of the offense of DUI. Instantly, we note that Altmann's challenge to the authenticity of his blood samples primarily concerns those periods of time where neither Trooper Richards nor Dr. Dolan could testify directly to the treatment and handling of the specimen kit. We reiterate, however, that the Commonwealth was not required "to produce as witnesses all persons who were in a position to come into contact with the" specimen kit, and that the trial court could admit such physical evidence "despite gaps in testimony regarding [its] custody." *Feliciano*, 67 A.3d at 29. As such, the trial court could rely on evidence, "direct *or circumstantial*," to determine that the Commonwealth established "a reasonable inference that the identity and condition of the [specimen kit] remain[ed] unimpaired" at the time of its testing. *Id*. (emphasis added).

Here, the Commonwealth relied on the testimony of Trooper Richards to establish the link between his possession of the sealed specimen kit and its transfer, in like condition, to Wyoming Regional Laboratory. Pertinently, when the Commonwealth presented the trooper with the PSP Blooming Grove

toxicology request form, he agreed that it represented "a fair and accurate depiction of the log submission with regard to the blood sample [he] saw removed from . . . Altmann's arm[.]" N.T., 5/19/25, at 57. Trooper Richards explained that he filled out the form as part of the station's "process . . . to submit [a] blood sample for testing[,]" and that this allowed for the sample to be "transported by a trooper from PSP Blooming Grove to Wyoming Regional Laboratory." *Id*. at 56. With this foundation, the Commonwealth entered the request form into evidence; thus, the trial court could observe the evidence submission receipt appended to the document confirming the specimen kit's hand-delivery. *See* Commonwealth's Exhibit 8.

The Commonwealth similarly elicited testimony from Dr. Dolan to establish the link between the specimen kit's delivery to the Wyoming Regional Laboratory and his receipt of the blood samples therein for testing. With respect to the initial portion of this journey, Dr. Dolan testified that he was "familiar with the Wyoming Regional Laboratory" in the course of his work, and that the Harrisburg Crime Lab sometimes received samples from that facility due to its inability to test blood "for a DUID." N.T., 5/19/25, at 11. Based on his review of the documentation appended to the specimen kit and its contents, Dr. Dolan relayed that he could tell that his facility received it from Wyoming Regional Laboratory "by [an included] bar code and the fact that it says that it was sent to" that lab. *Id*. at 13.

With respect to the remainder of the specimen kit's chain of custody, Dr. Dolan expressed confidence in his lab's adherence to the standard protocols and procedures meant to ensure the integrity of a sample in its care. *See id*. at 26. Dr. Dolan explained that even though he was not physically present to receive the specimen kit or witness its intact seal, the chem tech who did was required by the lab's standard policy to make and document this observation in an evidence receiving worksheet. *See id*. at 14. Thus, only after the chem tech confirmed that the samples within the specimen kit had not "been tampered with" could he/she have labeled and transported them to "a secure refrigerated storage" for testing. *Id*. at 10, 12. In accordance with these same policies, Dr. Dolan testified that when he retrieved Altmann's samples for testing, he was able to confirm via the accompanying documentation and pictures prepared by the chem tech that "all the information [matched] what was on the request form[,]" including the lab number assigned to Altmann's case. *Id*. at 15. In this same vein, Dr. Dolan also verified that "the name on the tube [retrieved from the kit] was [indeed] Altmann." *Id*. Finally, Dr. Dolan relayed that even though his laboratory's electronic management system failed to fully document the specimen kit's chain of custody electronically while it was in his care, he was resolute that his manual documentation of the specimen kit's whereabouts during this period prevented him from having any "concerns [regarding the] chain of custody that would result in [his] not reporting the results[.]" *Id*. at 26.

Crucially, the trial court found the above testimony from both Trooper Richards and Dr. Dolan to be credible with respect to "the provenance of the blood sample, the following of proper chain-of-custody procedures, and the test results." Trial Court Opinion, 10/17/25, at 3. Moreover, the court emphasized that aside from Altmann's speculation stemming from the Commonwealth's failure to present as a witness every person who could have come into contact with the specimen kit prior to its testing, he presented no evidence that any tampering or substitution occurred at any point along the Commonwealth's established chain of custody. *See id*. at 3-4; *see also Feliciano*, 67 A.3d at 265. Accordingly, this record does not evince a determination that the Commonwealth's evidence was "so tenuous, vague and uncertain" that the trial court abused its discretion by finding it sufficient to "establish a reasonable inference that the identity and condition of [Altmann's blood samples] remain[ed] unimpaired" at the time of Dr. Dolan's testing. *Smith*, 146 A.3d at 265; *see also Feliciano*, 67 A.3d at 29. Hence, we hold that Altmann's second issue is without merit.

In his third and final issue, Altmann argues the trial court abused its discretion by denying him bail pending appeal. Before we review the merits of this issue, however, we preliminarily examine it for mootness. "[A]n issue before a court is moot if in ruling upon the issue the court cannot enter an order that has any legal force or effect." *Commonwealth v. Nava*, 966 A.2d 630, 633 (Pa. Super. 2009). Here, the record reflects that Altmann began

serving his sentence of three-to-six months' imprisonment for DUI on July 30, 2025. Accordingly, Altmann would have finished serving this sentence on January 30, 2026, at the latest. Consequently, even if this panel were to determine that the trial court improperly denied Altmann bail pending appeal, there is no form of relief that we could presently grant him that would have any legal force or effect. *See Nava*, 966 A.2d at 633. Thus, because we determine that Altmann's third and final issue is moot, we decline to address its merits. *See id*.

As we determine that Altmann is not due any relief for each of his three issues, we affirm his judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/30/2026